Filed 10/25/13  Raven Aeronautical Holdings v. Royal Jet CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RAVEN AERONAUTICAL HOLDINGS, LLC, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> ROYAL JET, INC., <br><br>     Defendant and Appellant. | D061177 <br><br><br> (San Diego Super. Ct. Nos. 37-2009-00103575-CU-BC-CTL, 37-2011-0035164-CU-UD-EC, 37-2011-00066191-CU-UD-EC, 37-2011-00089522-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Boudreau Williams, Jon R. Williams for Defendant and Appellant.

Buchalter Nemer, Robert M. Dato; Godes & Preis, Joseph M. Preis and Oliver B. Dreger for Plaintiff and Respondent.

The principal issue in this unlawful detainer action is one of contract interpretation.  Royal Jet, Inc. (Royal) appeals a judgment in favor of Raven Aeronautical Holdings, LLC (Raven) entered after the trial court determined Raven's predecessor's

voluntary surrender of a master lease with the County of San Diego (the County) simultaneously terminated Royal's "Lease and Sublease" (sublease) with Raven's predecessor. Paragraph 15 of the sublease provides that "[in] the event of the termination of the Sublessor's interest as Lessee under the Master Lease *for any reason,* then this Sublease shall terminate coincidentally therewith without any liability of Sublessor or County to Sublessee." (Italics added.) Royal contends the court misinterpreted the sublease by narrowly focusing on paragraph 15 and not considering other contract provisions and extrinsic evidence showing the contracting parties intended to protect Royal against the early termination of the master lease. Royal also contends Raven lacks standing to pursue this action because the requisite landlord-tenant relationship is absent. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998 Royal entered into a 30-year master lease with the County for the use of three parcels of undeveloped property adjacent to Gillespie Field. Royal improved the property with facilities for its private jet charter business, including an office building and three hangars.

Royal later wanted to downsize, and in 2005 it assigned its interest in the master lease to Jet Air FBO, LLC (Jet Air) in exchange for Jet Air's payment of $5 million. The County consented to the assignment. Royal and Jet Air then entered into a sublease, under which Royal retained one of the hangars "at a rental far below market value." As required by the County, paragraph 15 of the sublease provides that termination of Jet

2

Air's interest as lessee under the master lease "for any reason" shall terminate Royal's sublease without liability of either Jet Air or the County to Royal.

Further, paragraph 4 of the sublease provides: "The Term of this [sublease] shall commence on June 1, 2005 or such later date when the Master Landlord consents to the terms of this [sublease] and any other consent required by the Master Landlord. This [sublease] will terminate with termination of Master Lease or any extension of Master Lease, *unless sooner terminated in accordance with the provisions of this* [*sublease*]." (Italics added.) Paragraph 7(a) provides: "If the Master Lease terminates, this [sublease] shall terminate and the parties shall be relieved of any further liability or obligation under this [sublease]."

A dispute eventually arose between Royal and Jet Air, and in 2009 Royal sued Jet Air. Jet Air cross-complained against Royal. Further, in March 2011 Jet Air filed an unlawful detainer action against Royal.

In June 2011 Jet Air voluntarily surrendered the master lease to the County as part of a deal in which Raven purchased Jet Air for $5 million and entered into a new lease with the County. It is undisputed that the master lease terminated on June 21, 2011.

Royal, however, refused to vacate the property. Raven brought an unlawful detainer action against it, alleging that under the plain language of the sublease it terminated simultaneously with the master lease. Royal filed a new action against Jet Air for fraud, breach of contract based upon the commercial lease, and breach of the implied covenant of good faith and fair dealing. It also named Raven and the County on counts for intentional and negligent interference with contract.

3

The parties stipulated to the consolidation of the four actions, with Raven's unlawful detainer action to be heard first. After a two-day bench trial, in which the court considered extrinsic evidence, it issued a statement of decision in Raven's favor. The court noted that while under California law the rights of a subtenant cannot ordinarily be terminated by a voluntary surrender of a master lease (*Buttner v. Kasser* (1912) 19 Cal.App.755, 759-760), the rule is inapplicable here because the sublease expressly provides for its termination if the master lease was terminated for *any reason*. (*Chumash Hill Properties, Inc. v. Peram* (1995) 39 Cal.App.4th 1226, 1233 ["The *Buttner* rule has been held inapplicable as a matter of law where the termination of the lease terminated the sublease."].)

The court noted the "language is clear, unambiguous and repeated in the Sublease." The court also noted, "[a]lthough Royal . . . may have wished to remain until at least 2028, it accepted the provision in the Sublease required by the County and took the risk of early termination." The court issued a judgment evicting Royal from the premises. Royal's motion for a new trial was unsuccessful.

DISCUSSION

I

*Contract Interpretation*

Royal contends the court misinterpreted the sublease. " 'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] "The words of a contract are to be

4

understood in their ordinary and popular sense." ' [Citations.] 'The language of [the] contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' " (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 913.)

It is undisputed that paragraph 15 clearly and explicitly calls for the termination of the sublease on the termination of the master lease *for any reason* and thus if only paragraph 15 is considered the court's ruling is correct. Royal, however, contends that read as a whole the sublease is ambiguous and subject to explanation through extrinsic evidence. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641; Code Civ. Proc., § 1858.)

"An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence." (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360-361.) "Extrinsic evidence is admissible to prove a meaning *to which the contract is reasonably susceptible*. [Citations.] If the trial court decides, after reviewing the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. [Citations.] Thus, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' [Citation.] [¶] The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably

5

susceptible to the interpretation urged—is a question of law subject to de novo review." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955, italics added.)

Royal relies on *Northridge Hospital Foundation v. Pic 'N' Save No. 9, Inc.* (1986) 187 Cal.App.3d 1088 (*Northridge*), in which a paragraph of a sublease provided it "was subject to the master lease, and that in the event the 'overlease shall terminate for any reason whatsoever, then this lease shall also terminate simultaneously therewith and neither party hereunder shall acquire any right or cause of action against the other by reason of such termination." (*Id.* at p. 1092.) The trial court in *Northridge* found that, under the plain language of the sublease, the termination of the master lease terminated the sublease. (*Id.* at pp. 1093-1094.)

The appellate court reversed. It concluded that while the paragraph at issue was unambiguous standing alone, the sublease considered as a whole was uncertain, and the uncertainty must be construed against the sublessor as the drafting party. (*Northridge*, *supra*, 187 Cal.App.3d at pp. 1095, 1099.) In *Northridge,* both the master lease and the sublease contained an absolute option to renew, which the court construed as "an implied agreement of the sublessor to protect its sublessee" by renewing the master lease and sublease. (*Id.* at p. 1098.)

*Northridge*, *supra*, 187 Cal.App.3d 1088 is distinguishable, however, because here the sublease contains no type of option to renew. Rather, paragraph 4 of Royal's sublease, which sets forth the term of the sublease, states, "This Lease [sublease] will terminate with termination of Master Lease or any extension of Master Lease, *unless*

6

*sooner terminated in accordance with the provisions of this* [*sublease*]." (Italics added.) This does not create an ambiguity or impliedly protect Royal from the early termination of the sublease.

In an attempt to overcome the plain language of paragraph 15 and to fall within the ambit of *Northridge*, *supra*, 187 Cal.App.3d 1088, Royal cites paragraph 31, which provides: "Sublessor shall use its reasonable efforts to seek to obtain a commercially reasonable non-disturbance agreement from Master Lessor for the benefit of Sublessee." "Nondisturbance agreements between a lessor and a sublessee typically provide that notwithstanding a default under or termination of the prime lease, the sublease will remain undisturbed as a lease between the prime lessor and sublessee if the sublessee is paying and performing its obligations under the sublease." (Miller & Starr, Cal. Real Estate Digest 3d (2012) Landlord and Tenant, § 123.)

Paragraph 31, however, did not create ambiguity or impliedly require Jet Air to protect Royal by not voluntarily surrendering the master lease. Rather, paragraph 31 would protect Royal from the early termination of the master lease only if the County would cooperate, a matter Royal surely realized was beyond Jet Air's control, as well as unlikely given the County's insistence on paragraph 15.[1] Indeed, the remainder of paragraph 31 acknowledges that Jet Air's inability to obtain a nondisturbance agreement

---

[1]    The court's statement of decision explains, "Upon inquiry, Dan Gayet [principal] of Jet Air was advised that the County did not issue non-disturbance agreements. Royal . . . never pursued the matter and Hadi Stein's [Royal's principal] testimony to the contrary is not credible."

7

"shall not impair the validity or enforceability of this Sublease." This is not a similar scenario to that in *Northridge* or to that in *Texas Co. v. Adelman* (1939) 186 Okla. 663 [99 P.2d 874], the opinion upon which *Northridge* relied. (*Northridge*, *supra*, 187 Cal.App.3d at p. 1097.)

Royal's reliance on paragraphs 7(a) and 7(b) of the sublease is similarly misplaced. In relevant part, paragraph 7(a) provides: "Lessor specifically shall not amend the terms of the Master Lease without the consent of Lessee." In relevant part, paragraph 7(b) provides: "Lessor is obligated to send to Lessee a copy of any notice or correspondence with Master Landlord regarding 'Master Premises' immediately after receiving such letter." Neither of these provisions renders paragraph 15 of the sublease uncertain or impliedly protects Royal from the voluntary surrender of the master lease. As the trial court explained, "unlike in *Northridge,* there is no factual basis to imply an agreement to contradict the clear, unambiguous language of the Sublease calling for contemporaneous termination of the Sublease upon termination of the Master Lease for any reason."

Contrary to Royal's assertion, the court did not ignore these additional sublease terms. Rather, the court considered them and specifically rejected the applicability of *Northridge*. Ignoring evidence and finding it unpersuasive are different matters.

Royal also complains that the court refused to consider evidence outside the sublease. In its opening brief, however, Royal does not specify any extrinsic evidence the court disallowed. "It is the duty of counsel to refer us to the portion of the record supporting his [or her] contentions on appeal. [Citations.] . . . [Citations.] 'It is neither practical nor appropriate for us to comb the record on [the appellant's] behalf.' "

8

(*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738; Cal. Rules of Court, rule 8.204(a)(1)(C) & (a)(2)(C).) " 'If no citation "is furnished on a particular point, the court may treat it as waived." ' " (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384.) While Royal offers a few citations in its reply brief, " '[w]ithholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . . Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before.' " (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93.)

In any event, our independent review of the record shows the court essentially gave Royal carte blanche to present extrinsic evidence and the court considered it provisionally to determine whether it was admissible to aid in the interpretation of the sublease. Royal's assertion that the court "never considered [the] extrinsic evidence to determine whether the Sublease is susceptible to Royal's interpretation" is far afield from the facts. For instance, the court allowed Stein to testify at length as to the provisions in the sublease, even over an objection that the document spoke for itself.[2]

Royal is also mistaken in asserting that the extrinsic evidence was admissible to aid in the interpretation of the sublease. We agree with the court that, as a matter of law,

---

[2] The court also allowed Royal to call Gayet, David Cohen (a Raven principal), and Jeffrey Winslow, who is in the business of aircraft management and an acquaintance of Stein. In its reply brief, Royal points out that the court sustained an objection to Gayet's testimony as to his "understanding" of paragraphs 4 and 7 of the sublease, on the ground the document spoke for itself. Royal does not, however, contend paragraph 4 shows paragraph 15 is uncertain and thus Gayet's understanding is immaterial. Moreover, Royal had taken Gayet's deposition and there was no offer of proof or suggestion that Gayet would have testified favorably to Royal on either paragraph 4 or 7.

9

the evidence was not reasonably susceptible to Royal's interpretation that paragraph 15 of the sublease does not mean what it says. The only evidence Royal cites pertains to Stein's *belief* that the sublease would be jeopardized only if Jet Air defaulted under the master lease or attempted to modify the master lease to shorten its term. Under California law, however, "the subjective, unexpressed beliefs of the parties do not serve as the basis for [determining] whether or not a contract is formed. Instead, the mutual assent necessary to form a contract is determined under an objective standard applied to the outward manifestations or expressions of the parties." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 150; *Central Building, LLC v. Cooper* (2005) 127 Cal.App.4th 1053, 1064-1065.)[3] We conclude the court's ruling is correct.

II

*Standing*

Additionally, Royal contends Raven lacked standing to bring an unlawful detainer action because there was no landlord-tenant relationship between the parties, and thus reversal for lack of jurisdiction is required. Royal is mistaken. Code of Civil Procedure section 1161, subdivision 1, provides that a tenant is guilty of unlawful detainer when it continues in possession after the expiration of the lease term "without the permission of [its] landlord, *or the successor in estate of [its] landlord, if applicable.*" The italicized language logically extends the unlawful detainer remedy to a successor in interest such as Raven. (See *Bank of America Nat'l Trust & Sav. Asso. v. Button* (1937) 23 Cal.App.2d

---

3    As the court noted, "Whether Jet Air violated the covenant of good faith and fair dealing is not before the court in this [unlawful detainer] proceeding."

10

651, 652-653 [lessor's successor in interest had standing to bring unlawful detainer action].)  Royal ignores Code of Civil Procedure section 1161, subdivision 1, even in the reply brief after Raven discussed the statute in the respondent's brief.

## DISPOSITION

The judgment is affirmed.  Raven is entitled to costs on appeal.


McCONNELL, P. J.

WE CONCUR:


McDONALD, J.


AARON, J.

11